UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/02/2022
```

---------------------------------------------------------------------X
                                  :

ETHEL RICHARDS,                     :

                          :

              Plaintiff,      :

                          :          21-cv-338 (LJL)

      -v-                     :

                          :      OPINION AND ORDER

THE DEPARTMENT OF EDUCATION OF THE CITY :
OF NEW YORK and THE BOARD OF EDUCATION :
OF THE CITY SCHOOL DISTRICT OF NEW YORK, :

                          :

              Defendants.    :

                          :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants the Department of Education of the City of New York and the Board of

Education of the City School District of New York[1] ("Defendants") move, pursuant to Federal

Rule of Civil Procedure 12(b)(6), to dismiss the amended complaint of plaintiff Ethel Richards

("Richards" or "Plaintiff") for failure to state a claim upon which relief can be granted.  Dkt. No.

16.  Plaintiff alleges discrimination and a hostile work environment based on her race, religion,

and disabilities, and alleges retaliation.  Dkt. No. 11.

For the following reasons, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the Court accepts as true the well-pleaded allegations of

Richards's amended complaint.  Dkt. No. 11 ("Amended Complaint" or "Am. Compl.").

Richards works as an Educational Administrator Level II at the New York City

Department of Education's Central Based Support Team ("CBST") Division of Specialized

---

[1] The New York City Department of Education is formally the Board of Education of the City
School District of the City of New York.  Dkt. No. 17 at 1 n.1.

Instruction and Student Support.  *Id.* ¶ 7.  Her job is to facilitate the educational placement of children with disabilities.  *Id.*  She works at the Brooklyn CBST office and is a case manager on the "Queens Team."  *Id.* ¶¶ 20–21, 24, 27, 32.  Richards has worked for the New York City Department of Education from 2000 until the present.  *Id.* ¶ 8.  At all times relevant, Richards performed her job responsibilities in an exemplary manner and received all satisfactory yearly ratings.  *Id.* ¶¶ 12, 69.

Richards is African American and Christian.  *Id.* ¶ 6.  She suffers from tarsal tunnel syndrome (severe compression of the tibial nerve) and chronic back pain and neck pain from two car accidents.  *Id.* ¶¶ 6, 9.  As a result, Richards experiences "throbbing, unrelenting, chronic pain," and her day-to-day activities are affected in many ways.  *Id.* ¶ 10; *see also id.* ¶ 11.  For example, Richards cannot sit for long periods because her back begins to ache in any chair that is not ergonomically built.  *Id.* ¶ 11.

The Amended Complaint alleges that Richards has been subjected to disparate treatment and a hostile work environment due to her race, religion, and disabilities and that she has been subjected to retaliation for protected activity under the anti-discrimination laws.  It identifies the discriminating officials as Deputy Director Bernice Farnham ("Farnham"), who was Richards's director supervisor, and Executive Deputy Director Esther Gutwein ("Gutwein")—both of whom are Caucasian and Jewish.[2]  *Id.* ¶ 12.  Farnham retired on January 1, 2020, and Gutwein retired nine months later, on September 18, 2020.  *Id.*  The Amended Complaint alleges incidents from 2016 to 2020.

---

[2] The Amended Complaint alleges that Gutwein is Orthodox Jewish, but the particular form of Judaism is irrelevant for purposes of this motion.

Starting in 2016, Richards requested an ergonomic chair to accommodate her disabilities. *Id.* ¶ 13.  Farnham refused to provide Richards with an ergonomic chair multiple times.  *Id.* Richards eventually received an ergonomic chair in July 2019 when Farnham's supervisor intervened after Richards escalated her request.  *Id.*

In 2018, Richards had great difficulty in receiving bereavement leave after her brother passed away unexpectedly.  *Id.* ¶ 15.  Richards's payroll secretary and CSA representative[3] had to assist her in getting the proper forms for signature.  *Id.*  Farnham repeatedly gave Richards the incorrect form and would not approve the time off because Farnham said that Richards was only entitled to three days.  *Id.* ¶ 16.  As a result, Richards had to complete her payroll time sheet several times while Farnham "stood over her flippantly asking, 'When's the funeral?'"  *Id.* ¶ 17. The Amended Complaint alleges that similarly situated Caucasian and Hispanic colleagues who had not engaged in protected activity have had deaths in their families, but, upon information and belief, none of them had difficulties in obtaining bereavement leave.  *Id.* ¶ 14; *see also id.* ¶ 17.

On or about April 19, 2019, Farnham wrote up Richards via a disciplinary letter-to-file after Farnham falsely accused Richards of not responding to the parent of a child even though Richards emailed Farnham the information the parent requested.  *Id.* ¶ 18.

On or about May 14, 2019, Farnham screamed at Richards publicly in an open office, causing her embarrassment and humiliation and resulting in Richards using her banked reserve time to leave early for the day.  *Id.* ¶ 19.  Farnham had insisted that Richards walk a school psychologist through a Prior Written Notice ("PWN"), a packet indicating that a placement has

---

[3] Though not defined in the Amended Complaint, a CSA representative appears to be a representative for the Council of School Supervisors and Administrators, the collective bargaining unit for principals, assistant principals, supervisors, and education administrators who work for the New York City public schools.

been found.  *Id.*  Richards had never in her career done a PWN and was not trained to develop a PWN; she also does not supervise school psychologists who have their own direct supervisor. *Id.*  After leaving early for the day and explaining to Farnham that she was feeling ill, Farnham continued to micromanage Richards with emails and directives to adjust her out-of-office voicemail and email and continued to email Richards that evening past 7:00 p.m.  *Id.*

Richards also alleges that her supervisors treated her differently from other case managers in response to parent complaints.  On or about May 22, 2019, a parent who is African American approached Richards to lodge a complaint against case manager James Welker ("Welker").  *Id.* ¶ 20.  Welker is Caucasian, has no disability, and has not engage in protected activity.  *Id.* ¶¶ 20–21.  The parent complained that Welker was not responsive to her child's placement needs and that she was unable to get in touch with him.  *Id.* ¶ 20.  Gutwein approached Richards and the parent and stated, "I know James, and he is professional."  *Id.*  On a previous occasion, when a disgruntled parent lodged a baseless complaint against Richards, she received a disciplinary letter-to-file.  *Id.*  Upon information and belief, however, Welker received no discipline from this complaint.  *Id.*

On another occasion, that same parent returned to voice her concerns to Richards about Welker and stated that she was very upset and not getting help with her child's placement.  *Id.* ¶ 21.  Gutwein denounced the parent, stated that Welker is a professional and that she knows that the case manager would be helpful, and stated that she knew the parent could not be telling the truth.  *Id.*  Gutwein told the parent to calm down, and Richards spent an hour trying to calm the parent.  *Id.* ¶ 22.  Gutwein then told them to leave the hallway as it was getting too loud.  *Id.* ¶ 23.  Richards escorted the parent out of the building and told her that, since Gutwein provided her business card and said she would follow up with her, the issue would be handled.  *Id.* ¶ 23.

The same parent returned a third time and was upset as no one had contacted her. *Id.* ¶ 24. Richards notified Gutwein that the parent had returned about the same issues and emailed Gutwein the parent's contact information. *Id.* If a parent did not like the placement found by Richards, Farnham and Gutwein added disciplinary letters-to-file in her personnel file; Welker, however, was not treated in the same way. *Id.* ¶ 25.

Richards was also subjected to confrontational treatment. Around May 2019, Supervisor of Psychologist Karina Korobov ("Korobov"), who is Caucasian and Jewish, worked out of the Brooklyn office where Richards worked. *Id.* ¶ 27. After Korobov would hold meetings, many staff members from those meetings would often continue their work at an empty workstation at the Brooklyn office. *Id.* One day, a staff member from one of those meetings worked at the empty desk of Zina Litvinovich ("Litvinovich"), who is Caucasian and Jewish. *Id.* ¶ 28. Farnham did not recognize the staff member. *Id.* Farnham called Richards into her office and screamed in her face, asking her, "Who did [Richards] think [she] was allowing someone to sit at Zina's desk where she has personal student information on her computer!" *Id.* Richards explained that the staff member had attended Korobov's meeting that day. *Id.* ¶ 29. Farnham looked up that staff member's name in the system and then warmly greeted the staff member. *Id.* Farnham did not confront Korobov about letting that staff member work at the vacant desk. *Id.*

On or about May 22, 2019, after Richards requested to leave early, Farnham ordered that, moving forward, Richards should "[p]lease advise at least a day in advance." *Id.* ¶ 30. No other case manager had to abide by this twenty-four-hour advanced notice mandate. *Id.*

Farnham also denied Richards's request to access the remote control to operate the air conditioner in the office when the office temperature was rising and very hot. *Id.* ¶ 31. Farnham

directed that the remote control remain in the desk of Litvinovich who was in the office only two days per week. *Id.*

Around June 2019, Richards's workload was increased without her input after the number of case managers on her team, the Queens Team, was reduced. *Id.* ¶ 33. After a colleague retired, a recently hired case manager to the Queens Team—Sari Alter ("Alter") who is Caucasian and Jewish[4]—was assigned part time to the Manhattan Team to help cover the retired colleague's workload. *Id.* ¶¶ 32, 53, 58. Farnham and Gutwein had met with Alter a full two weeks before the announcement to inform her of the decision. *Id.* ¶ 42. As a result of the change, Richards's team (i.e., the Queens Team), which historically had three full-time case managers, then had only two full-time case managers—Richards and Lisa Acquista ("Acquista"), who is Caucasian. *Id.* ¶¶ 14, 17, 32, 42, 52. This change was to be temporary until a new case manager was hired, but it became permanent soon thereafter. *Id.* ¶¶ 32, 34. A few months later, on or about January 9, 2020, at a meeting regarding case management, Gutwein discussed Alter's lighter workload on the Queens Team and stated that Alter received two "Days-of-Service" for the Manhattan Team and three "Days-of-Service" for the Queens Team, totaling five "Days-of-Service." *Id.* ¶ 53. The change affected only the Queens Team, and, in particular, affected Richards who—along with Acquista—had to cover the work that previously was covered by three full-time case managers. *Id.*

Richards was also micromanaged despite continually working hours after her workday. *Id.* ¶ 35. When Richards was granted time off to vote, she was made aware that she could not use her half-hour lunch to add onto her workday. *Id.* That rule, however, did not apply to Alter

---

[4] The Amended Complaint alleges that Alter is Orthodox Jewish, but, again, the particular form of Judaism is irrelevant for purposes of this motion.

"who left at 1:00 pm and then 2:00 pm during Shabbat." *Id.* Alter also received many approved days off to go to Israel and Detroit. *Id.* Alter was also allowed to go to several training sessions for her license and not report back to the office. *Id.*

Farnham also refused to support Richards when she raised the issue of hospital staff usurping what Richards has specified were "CBST placement protocols" when requesting placement for students in their care. *Id.* ¶¶ 36–37. When Richards explained the established protocols to a hospital staff member, that hospital staff member refused to speak with Richards in her role as the CBST case manager and refused to speak to anyone other than Richards's supervisor. *Id.* ¶ 37. Farnham then disciplined Richards with a disciplinary letter-to-file. *Id.* ¶¶ 37–38. On or about June 6, 2019 and June 7, 2019, Julie Cohen ("Cohen"), a case manager who is Caucasian and Jewish, raised the same issue in an open staff meeting. *Id.* ¶ 36. Cohen detailed the same obstacles with hospital staff previously pointed out by Richards in a staff meeting. *Id.* ¶¶ 38, 42. Farnham listened patiently to Cohen, and Cohen was not disciplined. *Id.* ¶ 38.

On or about June 19, 2019, Richards filed an internal OEO complaint[5] claiming race and disability discrimination and retaliation for her prior litigation and other complaints of discrimination. *Id.* ¶ 39. Richards had previously filed a federal lawsuit in 2010 that concluded in July 2015 and filed an internal complaint in 2014. *Id.* at 11 n.3; *see also Richards v. New York City Department of Education*, No. 13-cv-16 (S.D.N.Y).

After Richards complained again, Richards alleges that the discrimination and retaliation became more severe and pervasive. Am. Compl. ¶ 40. On or about June 20, 2019, Farnham

---

[5] OEO is not defined in the Amended Complaint, but it appears to refer to the Office of Equal Opportunity and Diversity Management of the New York City Department of Education.

scheduled a disciplinary meeting for Richards alleging baseless claims and then issued a lengthy disciplinary letter-to-file. *Id.* ¶ 41.  About a month later, on July 22, 2019, Gutwein interrupted Richards's lunch and ordered her to hand-deliver a disciplinary letter-to-file. *Id.* ¶ 43.

On or about July 22, 2019, Richards filed an external complaint of discrimination based on race, disability, and retaliation with the New York State Division of Human Rights ("NYSDHR"). *Id.* ¶ 44.  Soon thereafter, Richards alleges she was assigned three consecutive difficult cases in retaliation. *Id.*  Though these types of cases are always distributed in an alternating rotation, Richards received three of these difficult cases consecutively. *Id.*

On or about August 14, 2019, Richards's work-related computer equipment began failing, causing Richards to not be able to complete her work tasks. *Id.* ¶ 45.  Farnham ignored Richards's outreach for assistance. *Id.*  Farnham stood over Richards and screamed that Richards was "[f]alling behind on [her] work!" *Id.* ¶ 46.  Richards explained that her computer was not functioning and that she had followed protocol and procedure in trying to fix her computer. *Id.*  Farnham screamed in Richards's face and physically retrieved a computer technician to fix her computer. *Id.*  The help desk technician could not fix her computer, and Richards struggled to find a way to fix her computer and keep up with the increased workload. *Id.* ¶¶ 45, 47.  Farnham looked at Richards as lazy and unwilling to work even though Richards did not have a working computer, and Richards informed Mia Delane Gurley ("Gurley")—Deputy Senior Executive Director, CSEs Deputy Director, and Farnham's supervisor—and Dionne Wiggins ("Wiggins")—Director of Personnel Initiatives, Special Education Office—that this was occurring. *Id.* ¶ 48.

Thereafter, Richards formally requested via email to Wiggins that the hostile work environment stop and that Farnham cease her retaliatory behavior.  *Id.* ¶ 49.  Farnham suggested that Richards move her desk to another desk that also had a non-working computer.  *Id.*

On or about August 19, 2019, Richards was disciplined for a litany of items including starting an outside complaint without previously making Gurley aware of the complaint.  *Id.* ¶ 50.

On or about November 4, 2019, Gutwein told Richards again that she should not add her half-hour lunch period to essentially pad more time at the end of her workday.  *Id.* ¶ 51. However, Alter was allowed to add her half-hour lunch to the end of her workday every Friday during the winter months, and Gutwein signed and approved Alter's timesheet documenting this practice without question.  *Id.*

One day, when Richards was preparing to leave for the day, Farnham demanded that Richards immediately complete a very time-specific task that Alter had left undone.  *Id.* ¶ 54. Farnham had granted Alter leave time to celebrate the birth of her first grandchild.  *Id.*  The task at issue required many steps over several days to properly complete.  *Id.*  Farnham screamed in Richards's face while standing over her and told her that she had to complete Alter's task before Richards left that evening.  *Id.*  Richards called and emailed Alter and asked her to produce the relevant document or tell her where to find it.  *Id.*  During the call, Alter never gave Richards straight responses, said that she was having a wonderful time in Israel, and said she was boarding a plane and about to lose connectivity.  *Id.*  After that communication, Richards stayed for hours on the job without pay and finally emailed Farnham to say she could not complete the work.  *Id.* Upon information and belief, Alter was not disciplined.  *Id.*

Richards continued to reach out to Gutwein regarding her unequal workload.  *Id.* ¶¶ 52, 56.  She asked Gutwein what data she had relied on as the basis for removing a case manager from the Queens Team.  *Id.* ¶ 52.  No information was provided.  *Id.*  Richards followed up with both a verbal and an email request and then via a mediator from her union but received no response.  *Id.* ¶¶ 52, 56.  Richards's most recent request for equal and fair dissemination of work assignments was on December 23, 2020.  *Id.* ¶ 52.  As of December 23, 2020, Richards's workload increased again in alleged retaliation.  *Id.* ¶ 58.  Richards had 136 cases while Alter had 80 cases for the Queens Team.  *Id.*  Alter, however, also serves on the Manhattan Team and is assigned additional cases as a member of that team.  *Id.*

Gutwein also micromanaged Richards's work.  In March 2020, Gutwein divided up an assignment for case managers during a morning phone conference and did not state that there was a noon deadline.  *Id.* ¶ 59.  When Richards later projected that she would complete the assignment by 3:00 p.m. (depending on if others responded to her inquiries), Gutwein said that was not good enough and began to put undue pressure and stress on Richards.  *Id.*  Although Richards worked past 6:00 p.m. to complete the assignment, Gutwein still criticized Richards. *Id.*

Gutwein also publicly derided and humiliated Richards during staff meetings in March 2020.  *Id.* ¶ 60.  Gutwein's responses to Richards were often humiliating and publicly diminished Richards's concerns in front of her colleagues.  *Id.*

On March 26, 2020, Gutwein cancelled a private conference call check-in with Richards even though the same meetings were scheduled with all of Richards's colleagues.  *Id.*  As a result, Richards was essentially not being heard or allowed to speak freely on work related issues to the same extent as her colleagues.  *Id.*

During the COVID-19 quarantine at home, Gutwein scheduled a disciplinary meeting for Richards for June 5, 2020.  *Id.* ¶ 61.  Gutwein harassed Richards via email by constantly reminding her about the disciplinary meeting and by canceling and rescheduling.  *Id.*  These actions caused Richards stress, anxiety, and constant fear of losing her job during the COVID-19 pandemic.  *Id.*  Gutwein conducted the disciplinary meeting on June 29, 2020, and it lasted an unprecedented four hours.  *Id.* ¶¶ 26, 63; *id.* at 18 n.4.

On September 18, 2020, Richards received another disciplinary letter-to-file even though she had been quarantined and working from home since March 2020.  *Id.* ¶ 64.

## PROCEDURAL HISTORY

This case was originally filed in the Supreme Court of the State of New York on December 28, 2020 and was removed to federal court on January 14, 2021.[6]  Dkt. No. 1. Plaintiff filed an Amended Complaint on April 16, 2021.  Dkt. No. 11.  The Amended Complaint brings claims for discrimination based on race, religion, and disability, for a hostile work environment, and for retaliation under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, and the New York State Human Rights Law, N.Y. Exec. Law. § 296 *et seq.*; claims under the Americans with Disabilities Act, 42 U.S.C. § 12112, for discrimination based on disability and for retaliation; and claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for discrimination based on race and religion, for a hostile work environment, and for retaliation.  *Id.* ¶¶ 72–82.

Defendants moved to dismiss the Amended Complaint on June 3, 2021.  Dkt. No. 16. Plaintiff filed a memorandum of law in opposition on July 30, 2021, Dkt. No. 20, and Defendants filed a reply memorandum of law on October 18, 2021, Dkt. No. 30.

---

[6] Due to a filing error, the notice of removal was docketed on January 15, 2021.  Dkt. No. 3.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

### I.     Federal Claims

The Court will first address Plaintiff's federal claims under the Americans with Disabilities Act ("ADA") and Title VII of the Civil rights Act of 1964 ("Title VII") before turning to her claims under state and local law.

### A.     Timeliness

Defendants argue that any allegations in the Amended Complaint occurring before September 25, 2018—including the allegations regarding Plaintiff's denied requests for

reasonable accommodation—are time-barred.  Dkt. No. 17 at 5.  Plaintiff responds that the alleged incidents constitute a continuing violation and therefore are not time-barred; alternatively, Plaintiff argues that the allegations before September 25, 2018 should be considered as relevant background information.  Dkt. No. 20 at 10–13.

"Plaintiffs asserting claims under Title VII, the ADEA, or the ADA must first file a complaint with the Equal Employment Opportunity Commission (EEOC) or an equivalent state agency within 300 days of the allegedly discriminatory action."  *Gindi v. New York City Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019); *see also* 42 U.S.C. § 2000e-5(e)(1) (Title VII); 42 U.S.C. § 12117(a) (ADA); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) ("Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days after the alleged unlawful employment practice occurred." (internal quotation marks omitted)).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Although "only incidents that took place within the timely filing period are actionable," *id.* at 114, alleged incidents outside of this period may be used as "background evidence in support of a timely claim," *id.* at 113.

Here, Plaintiff's complaint of race and disability discrimination and retaliation was filed with the NYSDHR on July 22, 2019.  Am. Compl. ¶ 44.  Therefore, Plaintiff's grievances based on discrete acts prior to September 25, 2018—i.e., 300 days before the date of her complaint— are untimely under Title VII and the ADA.  The vast majority of the allegations of the Amended Complaint occurred within the timely filing period.

Defendants argue that the allegations regarding the denial of Plaintiff's requests for an ergonomic chair, however, are untimely.  Dkt. No. 17 at 5.  Denials of requests for accommodation are discrete acts.  *See Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134–35 (2d Cir. 2003) ("[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation.  Rather, the rejection is the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days."); *Gomez v. New York City Police Dep't*, 191 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) ("Courts in this district have regularly applied *Elmenayer* to failure to accommodate claims under the ADA." (collecting cases)).  Thus, to the extent the Amended Complaint alleges denials of requests for accommodation prior to September 25, 2018, those claims are untimely and not actionable, and those allegations may only serve as background evidence in support of a timely claim.

At least some of Plaintiff's claims regarding the denial of her requests for an ergonomic chair, however, might be timely.  "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove.  However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008) (citation omitted); *see also Wang v. Palmisano*, 51 F. Supp. 3d 521, 536 (S.D.N.Y. 2014) ("[T]he Court may dismiss claims as untimely pursuant to a Rule 12(b)(6) motion only if the defense appears on the face of the complaint." (internal quotation marks omitted)).  It is unclear from the face of the complaint when exactly Plaintiff's requests were denied and if any requests were denied after September 25, 2018.  The Amended Complaint specifies that "Plaintiff requested reasonable accommodations for her disabilities since 2016," that Farnham "refused these accommodations (ergonomic chair) multiple times," and that "Plaintiff finally received her ergonomic chair in

July 2019 due to [Farnham's] supervisor intervening after Plaintiff escalated her request."  Am. Compl. ¶ 13.  It does not allege the dates of those denials.  Depending on the date of the denial of one of Plaintiff's requests for accommodation and, in particular, whether the denial occurred on or after September 25, 2018, a failure-to-accommodate claim could be timely.

      **B.**      **Title VII Claim for Discrimination Based on Race and Religion**

      Defendants argue that Plaintiff does not state a plausible race or religious discrimination claim because Plaintiff fails to allege any adverse employment actions and because Plaintiff fails to allege any inference of discrimination related to her race or religion.  Dkt. No. 17 at 8–11, 13–16.  Plaintiff responds that she has sufficiently alleged adverse employment actions and that she has pleaded preferential treatment toward similarly situated employees outside of Plaintiff's protected class.  Dkt. No. 20 at 14–16, 18–19.

      Plaintiff's disparate treatment claim under Title VII "is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*."  *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  "A plaintiff can establish a prima facie case of discrimination sufficient to survive a motion to dismiss '[i]f she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation.'"  *James v. Borough of Manhattan Cmty. Coll.*, 2021 WL 5567848, at *5 (S.D.N.Y. Nov. 29, 2021) (quoting *Littlejohn*, 795 F.3d at 311).  The parties only disagree over whether Plaintiff has pleaded the third and fourth prongs of the prima facie case.

      **1.**      **Adverse Employment Action**

      The Amended Complaint fails to allege that Plaintiff suffered adverse employment actions as understood under Title VII.  "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Vega v.*

*Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quoting *Terry*, 336 F.3d at 138).  Because the definition of an adverse employment action under Title VII is the same as under the ADA, the Court will draw on cases from both contexts. *See Smith v. City of New York*, 385 F. Supp. 3d 323, 343 (S.D.N.Y. 2019); *see also Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71–72 (2d Cir. 2019).

Though the Amended Complaint describes how Plaintiff's supervisors Farnham and Gutwein treated her, it does not contain allegations that rise to the level of adverse employment actions.  "Although a reprimand can constitute an adverse employment action, 'courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.'" *Davis v. Goodwill Indus. of Greater New York & New Jersey, Inc.*, 2017 WL 1194686, at *7 (S.D.N.Y. Mar. 30, 2017) (quoting *Honey v. County of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); c*f. Bernstein v. New York City Dep't of Educ.*, 2020 WL 6564809, at *6 (S.D.N.Y. Nov. 9, 2020) ("Whether deserved or not, however, the disciplinary notice and disciplinary letters cannot constitute adverse employment acts on the basis of age on their own.").  Thus, the allegations in the Amended Complaint regarding disciplinary meetings and disciplinary letters-to-file, Am. Compl. ¶¶ 18, 20, 36–38, 41, 43, 50,

61, 63–64, are not adverse employment actions because they are not alleged to have been accompanied by any materially adverse consequences to the conditions of Plaintiff's employment such as demotion, diminution of wages, or other tangible loss.  *See Brown v. City of New York*, 2014 WL 5394962, at *8 (S.D.N.Y. Oct. 23, 2014) ("A negative evaluation or official reprimand may, in some circumstances, constitute adverse employment action, but only when it triggers negative consequences to the conditions of employment." (cleaned up)), *aff'd*, 622 F. App'x 19 (2d Cir. 2015).

The allegations that Farnham and Gutwein harshly criticized and yelled at Plaintiff, Am. Compl. ¶¶ 19, 27–29, 45–48, 54, 59–60, also do not constitute adverse employment actions. "Harsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment." *Fox*, 918 F.3d at 72; *see also Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 479 (2d Cir. 2009) (holding that "excessively harsh criticism by her boss" does not constitute adverse employment action).  "Being subjected to insulting language or unfair criticism in the presence of other employees does not constitute an adverse employment action without further indication of a 'material impact on the terms and conditions of . . . employment.'" *MacAlister v. Millenium Hotels & Resorts*, 2018 WL 5886440, at *4 (S.D.N.Y. Nov. 8, 2018).  Courts have also held that yelling does not qualify as an adverse employment action.  *See James v. Mun. Credit Union*, 2016 WL 698136, at *4 (S.D.N.Y. Feb. 19, 2016) ("Courts in this circuit have held that adverse comments, criticism, threats to . . . employment, close scrutiny, and yelling . . . do not qualify as adverse employment actions." (internal quotation marks omitted and alteration adopted)); *Barounis v. New York City Police Dep't*, 2012 WL 6194190, at *6 (S.D.N.Y. Dec. 12, 2012) (same); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (same); *see also E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816,

873 (S.D.N.Y. 2013) ("[Y]elling at an employee regarding a potentially falsified report does not amount to an adverse action."); *Sekyere v. City of New York*, 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) (concluding that defendants' alleged "yelling and screaming" does not amount to materially adverse change in terms and conditions of plaintiff's employment). Although the alleged confrontations may have been inappropriate, there are no allegations tying these incidents to any material changes in Plaintiff's employment. Similarly, the allegations that Plaintiff was denied access to the air conditioner remote control and that Gutwein cancelled a check-in call with Plaintiff, Am. Compl. ¶¶ 31, 60, are examples of "[e]veryday workplace grievances, disappointments, and setbacks [that] do not constitute adverse employment actions within the meaning of Title VII." *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 260 (S.D.N.Y. 2011), *aff'd*, 513 F. App'x 34 (2d Cir. 2013).

The Amended Complaint's allegations regarding Plaintiff's difficulty in receiving bereavement leave, the requirement that Plaintiff inform Farnham a day in advance when she planned to leave early, and Plaintiff's inability to add her half-hour lunch to the end of her workday, Am. Compl. ¶¶ 14–17, 30, 35, 51, are also not adverse employment actions. These allegations are examples of "mere inconvenience[s]" rather than materially adverse changes in the terms and conditions of employment. *Vega*, 801 F.3d at 85; *cf. Smith*, 385 F. Supp. 3d at 336 ("Numerous courts in this District have held that denial of administrative leave is not an adverse employment action, even when the denial causes the employee to use allotted sick days." (citing cases)); *Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("[D]enial of vacation time and alteration of Plaintiff's lunch schedule, taken alone, do not rise to the level of an adverse employment action."); *Castro v. New York City Bd. of Educ. Pers.*, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring

may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."); *Albuja v. Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 608 (S.D.N.Y. 2012) ("Where the change in schedule does not occasion a reduction in wages or job responsibilities, unfavorable schedules are a 'mere inconvenience' and not an adverse employment action.").

All that is left are the allegations that Plaintiff faced an increased workload as compared to case manager Alter, Am. Compl. ¶¶ 32–34, 58; these allegations likewise do not constitute an adverse employment action.  "While an increased workload is considered only a mere alteration of job responsibilities, a workload heavily disproportionate to those similarly situated has been held to be an example of an adverse action."  *Ahmad v. New York City Health & Hosps. Corp.*, 2021 WL 1225875, at *21 (S.D.N.Y. Mar. 31, 2021) (quoting *Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007)); *see also Vega*, 801 F.3d at 85 ("We have held that the assignment of 'a disproportionately heavy workload' can constitute an adverse employment action." (citing *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004))).  The Amended Complaint alleges that Plaintiff's workload on the Queens Team increased because Alter, a recently hired case manager to the Queens Team, was partly assigned to the Manhattan Team to cover the workload of a retiring colleague.  Am. Compl. ¶¶ 32–33, 58.  It also alleges that, as of December 23, 2020, Plaintiff had 136 cases while Alter had 80 cases as part of the Queens Team, but that Alter also served on the Manhattan Team and was assigned additional cases.  *Id.* ¶¶ 53, 58.  As discussed in greater detail *infra* Section I.B.2, these allegations demonstrate that Plaintiff and Alter were not similarly situated as Plaintiff was assigned only to the Queens Team while Alter served on two different teams.  *See Ahmad*, 2021 WL 1225875, at *22 (concluding that assignment to higher-workload shifts was not adverse employment action

where those assigned to lower-workload shifts were not similarly situated).  Thus, as pleaded, the allegations do not plausibly amount to a heavily disproportionate workload between similarly situated individuals and do not constitute an adverse employment action.

Because the Amended Complaint does not allege that Plaintiff suffered an adverse employment action, Plaintiff cannot establish a prima facie case of discrimination based on race and religion under Title VII sufficient to survive a motion to dismiss.

### 2.    Inference of Discriminatory Motivation

Plaintiff's Title VII discrimination claim fails for another reason.  Even assuming the Amended Complaint alleges conduct that amounts to adverse employment actions, it does not sustain the minimal burden of containing factual allegations sufficient to suggest an inference of discriminatory motivation based on race or religion.

"At the motion to dismiss stage, a plaintiff 'need only give plausible support to a minimal inference of discriminatory motivation.'"  *James*, 2021 WL 5567848, at *5 (quoting *Littlejohn*, 795 F.3d at 311).  "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Littlejohn*, 795 F.3d at 312.  "A plaintiff attempting to 'show[] that the employer treated [her] "less favorably than a similarly situated employee outside [her] protected group" . . . "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."'"  *James*, 2021 WL 5567848, at *5 (alterations in original) (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "What will constitute 'all material respects' will vary from case to case, of course."  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014).  The Second Circuit has stated that "the judgment rests on whether

the plaintiff and those she maintains were similarly situated were subject to the same workplace standards" and whether "the plaintiff's and comparator's circumstances . . . bear a reasonably close resemblance" even if they "need not be identical." *Id.* (internal quotation marks omitted and alteration adopted); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (stating on summary judgment that the determination must be "based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness"); *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (stating on summary judgment that "[a]n employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct'" (quoting *Graham*, 230 F.3d at 40)).

The Amended Complaint does not allege that Plaintiff's performance was criticized in racially or religiously derogatory terms or that there were invidious comments about others of Plaintiff's race or religion. Instead, the Amended Complaint relies on allegations that Plaintiff was treated less favorably than employees outside of Plaintiff's protected group who Plaintiff asserts are similarly situated. But the pleading falls short because it either does not identify similarly situated employees or, for the employees it does identify, the pleading does not provide facts to support that they are similarly situated in all material respects.

The Amended Complaint, for example, does not raise a minimal inference of discriminatory motivation based on race or religion with respect to Plaintiff's difficulty in receiving bereavement leave and Plaintiff's treatment in response to parent complaints. The Amended Complaint alleges that, though Plaintiff encountered difficulty in receiving bereavement leave, "similarly situated colleagues with no protected activity have had a death in

their families, but upon information and belief, none of them had difficulties in obtaining time off, such as Julia Harding (Caucasian), Dalila Agront-Zapata (Hispanic), Lisa Acquista (Caucasian)."  Am. Comp. ¶ 14; *see also id.* ¶ 17 ("Plaintiff's Colleague, Lisa Acquista (Caucasian), and Julia Harding (Caucasian), sadly had a death in their family and received timely and proper approval/support.").  Additionally, a parent allegedly lodged complaints about Welker, who is Caucasian, but, "upon information and belief," Welker received no discipline. Am. Compl. ¶ 20.  By contrast, "[o]n previous occasions, when a disgruntled parent lodged a baseless complaint against Plaintiff, it resulted in a Disciplinary Letter-to-File."  *Id.*; *see also id.* ¶ 25 ("The disparity in treatment of Case Managers was apparent because both Deputy Director, Bernice Farnham and Executive Director Esther Gutwein papered Plaintiff's Personnel File with Disciplinary Letters-to-File if a parent did not like the due diligence placement Plaintiff found. This was not the treatment similarly situated counterpart James Welker (Caucasian) received.").

First, though the Amended Complaint lists the races of these particular colleagues, it does not identify their religions and therefore cannot support that Plaintiff was treated less favorably than individuals outside of her religion.

Second, with respect to the claim of racial discrimination, there are no factual allegations establishing that these identified colleagues were treated more favorably than Plaintiff.  The Amended Complaint alleges, on information and belief, that the several individuals listed did not face difficulties in obtaining bereavement leave and that Welker did not receive discipline.  The Second Circuit has held that a plaintiff may plead facts "upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."  *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and citations omitted).

Facts about whether Plaintiff's colleagues encountered difficulty in receiving leave or faced discipline are not the types of information that would be peculiarly in the sole possession of Defendants.  By definition, others would know those facts.  Moreover, the Amended Complaint does not offer facts to support the belief that these occurrences happened to Plaintiff's colleagues.

In addition, regarding discipline in response to parent complaints, the Amended Complaint does not allege enough facts to show that Plaintiff and Welker "engaged in comparable conduct, that is, conduct of comparable seriousness." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 20 (2d Cir. 2015) (summary order) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014)).  Though the Amended Complaint describes the incident involving Welker in detail, it provides comparatively few allegations regarding the circumstances under which Plaintiff received disciplinary letters-to-file in response to parent complaints.  *See* Am. Compl. ¶ 20 ("On previous occasions, when a disgruntled parent lodged a baseless complaint against Plaintiff, it resulted in a Disciplinary Letter-to-File."); *id.* ¶ 25 (alleging that Farnham and Gutwein "papered Plaintiff's Personnel File with Disciplinary Letters-to-File if a parent did not like the due diligence placement Plaintiff found").  Without additional facts, there is insufficient information from which an inference can be drawn that Plaintiff and Welker engaged in comparable conduct.  Due to these deficiencies, the allegations are insufficient to "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Therefore, as pleaded, the allegations about these incidents are insufficient to raise a minimal inference of discriminatory motivation based on race or religion.

The allegations regarding how Plaintiff's supervisors treated her differently than Alter similarly fail to raise a minimal inference of discrimination based on race or religion because the

Amended Complaint does not plausibly allege that Plaintiff and Alter are similarly situated. Around June 2019, Alter, who is Caucasian and Jewish and had been recently hired as a case manager on the Queens Team, was assigned to the Manhattan Team to cover a retired colleague's workload.  Am. Compl. ¶¶ 32–34.  Alter was allowed to go to several training sessions for her license and not report back to the office; she also received many approved days off to go to Israel and Detroit.  *Id.* ¶ 35.  As of December 23, 2020, Plaintiff had 136 cases while Alter had 80 cases; Alter, however, also served on the Manhattan Team and was assigned additional cases.  *Id.* ¶ 58.  Unlike Plaintiff, Alter was allowed to add her half-hour lunch onto the end of her workday every Friday during the winter months.  *Id.* ¶ 51; *see also id.* ¶ 35 (alleging that the rule not allowing Plaintiff to add her lunch onto her workday did not apply to Alter who "left at 1:00 pm and 2:00 pm during Shabbat").  At one point, Farnham also required Plaintiff to complete a time-specific task that Alter had not completed before taking leave, and, upon information and belief, Alter was not disciplined.  *Id.* ¶ 54.

Though the allegations describe differential treatment, they fail to show that Plaintiff and Alter are similarly situated in all material respects.  First, the allegations do not demonstrate that Plaintiff and Alter were subject to the "same workplace standards," *Graham*, 230 F.3d at 40, or the "same performance evaluation and discipline standards," *Ruiz*, 609 F.3d at 494.  In fact, the allegations themselves highlight several key ways in which Plaintiff and Alter were differently situated with respect to their work responsibilities, for example: Plaintiff was part of the Queens Team while Alter served on two different teams; Plaintiff had worked for Defendants for many years while Alter had been recently hired; and Alter was attending training sessions for her license.  Without further factual enhancement, the Amended Complaint does not plausibly allege that Plaintiff and Alter were subject to the same workplace standards and that they were thus

similarly situated.  Additionally, even assuming Plaintiff and Alter were subject to the same workplace standards, the pleadings fall short in alleging that Plaintiff's and Alter's circumstances bear reasonably close resemblance.  For instance, though Alter was granted time off, there are no allegations that Plaintiff was denied similar leave.  The allegation, upon information and belief, that Alter was not disciplined for not completing a task suffers from the same deficiencies regarding information and belief pleading discussed above; but even if Alter had not been disciplined, there are no allegations either that Alter was required to perform the task before she left for Israel or that Plaintiff was disciplined in similar circumstances.

Similar reasoning applies to the allegations regarding how Plaintiff was treated differently from Korobov and Cohen, who are both Caucasian and Jewish.  The Amended Complaint does not show that Plaintiff was similarly situated to each of them.  Plaintiff alleges that while Farnham screamed at Plaintiff, Farnham did not confront Korobov about letting a staff member work at a vacant desk.  Am. Compl. ¶¶ 27–29.  As pleaded, there are no allegations that Korobov was subject to the same workplace standards; indeed, Korobov notably does not appear to be so as she is a Supervisor of Psychologist and not a case manager under the supervision of Farnham and Gutwein like Plaintiff is.  *Cf. Novick v. Vill. of Wappingers Falls, New York*, 376 F. Supp. 3d 318, 44 (S.D.N.Y. 2019) (citing *Robinson v. Am. Int'l Grp., Inc.*, 2009 WL 3154312, at *4 (S.D.N.Y. Sept. 30, 2009), in the ADA context as "holding that one of the reasons that proposed comparators were not appropriate was that they held job titles that were different from the plaintiff's job title").  Plaintiff also alleges that though she received a disciplinary letter-to-file after raising an issue regarding hospital staff in a staff meeting and after an incident involving a hospital staff member's refusal to speak to Plaintiff, Cohen—a retiring colleague— was not disciplined for raising the same issue in a staff meeting.  Am. Compl. ¶¶ 36–38, 42.

Here, though the circumstances need not be identical, the allegations do not reflect circumstances that bear reasonably close resemblance as the allegations regarding Plaintiff involve both raising the issue in a staff meeting and an actual incident involving hospital staff whereas the allegations about Cohen only involve raising the issue in a staff meeting.  *See Dooley*, 636 F. App'x at 20 (affirming district court's dismissal of Title VII discrimination claim where conduct was not comparable).  Because the pleadings do not show that Plaintiff was similarly situated to these other employees, the allegations fail to raise a minimal inference of discrimination based on race or religion.

The remaining allegations do not identify similarly situated comparators, *see Blige v. City Univ. of New York*, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017) ("Numerous courts within the Second Circuit have granted motions to dismiss disparate treatment claims where the complaint was entirely devoid of any details regarding the purported comparators, *e.g.*, who they are, what their positions or responsibilities were at [the company], how their conduct compared to plaintiffs' or how they were treated differently by defendants." (internal quotation marks omitted and alteration in original)), *report and recommendation adopted*, 2017 WL 1064716 (S.D.N.Y. Mar. 21, 2017), or are insufficient to show that Plaintiff's supervisors Farnham and Gutwein, who are both Caucasian and are Jewish, acted against Plaintiff on account of her being African American and Christian, *see, e.g.*, *Moore v. City of New York*, 2017 WL 35450, at *12 (S.D.N.Y. Jan. 3, 2017) ("Beyond merely identifying himself as an African American male and noting that a number of [the] [d]efendants involved in the alleged adverse actions suffered by [the plaintiff] are 'white' and/or 'female,' [the plaintiff] proffers no other facts to support his claim that [the] [d]efendants took action against him because of his membership in a protected class."), *report and recommendation adopted*, 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017).

* * *

For the foregoing reasons, Plaintiff's Title VII claim for discrimination based on race and religion is dismissed.

### C.    ADA Claim for Discrimination Based on Disability

With respect to Plaintiff's claim for disability discrimination under the ADA, Defendants again argue that Plaintiff has failed to plead an adverse employment action and also argue that Plaintiff has not alleged a causal connection between her disability and any adverse employment action.  Dkt. No. 17 at 8–13.  Plaintiff responds that the Amended Complaint sufficiently alleges both.  Dkt. No. 20 at 13–16.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 . . . (1973)."  *McMillan v. City of New York,* 711 F.3d 120, 125 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)). Under this framework, a plaintiff must first establish a prima facie case of discrimination under the ADA by demonstrating that:  "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability."  *Kinneary v. City of New York*, 601 F.3d 151, 156 (2d Cir. 2010) (quoting *Capobianco v. City of New York,* 422 F.3d 47, 56 (2d. Cir. 2005)).  At the pleading stage, a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation" and "need not give plausible support to the ultimate question of

whether the adverse employment action was attributable to discrimination." *Littlejohn*, 795 F.3d at 311; *Dawson v. New York City Transit Auth.*, 624 F. App'x 763, 767 (2d Cir. 2015) (applying the *Littlejohn* standard in reviewing the district court's dismissal of a plaintiff's ADA complaint). As the parties only dispute whether Plaintiff has sufficiently pleaded the fourth prong of the prima facie case, the Court focuses its analysis there.

As in the context of Plaintiff's Title VII claim, *see supra* Section I.B.1, Plaintiff has not alleged that she suffered any adverse employment actions under the ADA. *See Smith*, 385 F. Supp. 3d at 343 ("The definition of an 'adverse employment action' in the context of disability-based discrimination is the same as in the context of race-based discrimination." (citing cases)); *see also Davis*, 804 F.3d at 235; *Fox*, 918 F.3d at 71–72.

As with Plaintiff's Title VII claim, even assuming Plaintiff had alleged an adverse employment action, Plaintiff has not alleged facts to plausibly raise a minimal inference of discriminatory motivation based on disability. The standards under the ADA are analogous to the ones under Title VII. *See Dooley*, 636 F. App'x at 21 ("Although the elements of a prima facie case of discrimination under the ADA are . . . different from those under Title VII, a plaintiff must still 'demonstrat[e] that [s]he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent' under the former statute." (alteration in original) (citing *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015))). "Absent direct evidence demonstrating discriminatory intent, a plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of similarly situated employees but must show he was similarly situated in all material respects to the individuals with whom he seeks to compare himself." *Novick v. Vill. of Wappingers Falls, New York*, 376 F. Supp. 3d 318, 342–43 (S.D.N.Y. 2019) (internal quotation marks omitted and alterations adopted). "And to be

similarly situated in 'all material respects,' [the plaintiff] must 'show that similarly situated

employees who went undisciplined engaged in comparable conduct." *Id.* at 343 (quoting

*Graham*, 230 F.3d at 40).  "Moreover, although '[a]t the motion to dismiss stage, . . . evidence

[of similarly situated comparators] is not necessary[,] . . . a court still must determine whether,

based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately

determine that the comparators are similarly situated.'" *Id.* (alteration in original) (quoting

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y.

2011)).

Here, the Amended Complaint does not contain direct allegations of discriminatory

intent.  With respect to disparate treatment, aside from Welker (who is alleged to not have a

disability), Am. Compl. ¶ 21, the Amended Complaint fails to identify any non-disabled

comparators who were treated differently than Plaintiff.  Regarding Welker, for the same reasons

given above, *see supra* Section I.B.2, the allegations do not show that Plaintiff and Welker are

similarly situated.  As a whole, the Amended Complaint does not contain sufficient factual

matter to plausibly identify similarly situated comparators or otherwise raise a minimal inference

of discrimination on the basis of disability.

For these reasons, Plaintiff's ADA claim of discrimination based on disability is

dismissed.[7]

---

[7] It is unclear from the Amended Complaint and from Plaintiff's briefing whether Plaintiff brings an ADA failure-to-accommodate claim.  *See* Am. Compl. ¶ 79; Dkt. No. 20 at 13–14 (setting forth standard for pleading a prima facie case for disability discrimination but not for disability discrimination based on failure to accommodate).  Yet Plaintiff appears to reference such a claim in passing.  *See* Dkt. No. 20 at 16 (discussing Farnham's refusal to grant Plaintiff's request for an ergonomic chair).  The Court thus addresses this claim briefly here.  As discussed *supra* Section I.A, a failure-to-accommodate claim might be timely if Farnham denied Plaintiff's request after September 25, 2018.  "To plead a failure-to-accommodate claim, a plaintiff must allege that '(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer

### D.        Hostile Work Environment Claim under Title VII

Plaintiff also brings a claim under Title VII alleging a hostile work environment.[8]

Defendants argue that this claim must be dismissed because the allegations in the Amended

Complaint do not establish a relationship between the conduct alleged and Plaintiff's protected

characteristics.  Dkt. No. 17 at 16–18.  They further argue that the conduct was not severe or

pervasive enough to state a hostile work environment claim and that the alleged conduct did not

interfere with Plaintiff's job performance.  *Id.* at 18–20.  Plaintiff contends that this claim should

not be dismissed because the facts alleged must be considered holistically and relies on a

discussion of how the New York City Human Rights Law is more protective than its federal and

state counterparts.  Dkt. No. 20 at 20–21.

Title VII "makes it unlawful for an employer to require an employee to work in a

discriminatorily hostile or abusive environment."  *Sherman v. Fivesky, LLC*, 2020 WL 2136227,

at *5 (S.D.N.Y. May 5, 2020) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To

establish a hostile work environment, a plaintiff must allege "that a defendant's conduct: (1) was

objectively severe or pervasive in that it created an environment that a reasonable person would

---

covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff
could perform the essential functions of the job at issue; and (4) the employer has refused to
make such accommodations.'"  *Dooley*, 636 F. App'x at 18 (quoting *McMillan*, 711 F.3d at 125–
26).  The Amended Complaint falls short of stating such a claim.  The Amended Complaint
alleges: that Defendants were "aware of Plaintiff's disabilities," Am. Compl. ¶ 9; that "Plaintiff
requested reasonable accommodations for her disabilities since 2016, *id.* ¶ 13; that Farnham
"refused these accommodations (ergonomic chair) multiple times," *id.*; and that Plaintiff
received an ergonomic chair in July 2019, *id.*  In particular, facts regarding Defendants' notice of
Plaintiff's disability, including whether Defendants had notice that the request for the chair was
related to the disability, are lacking, and a complaint must offer more than "labels and
conclusions" and "a formulaic recitation of the elements of a cause of action" to survive
dismissal.  *Twombly*, 550 U.S. at 555.

[8] The Amended Complaint does not appear to allege a hostile work environment claim under the
ADA.  *See* Am. Compl. ¶ 79.  But even if it did, the claim would fail for the same reasons that
the claim for a hostile work environment fails under Title VI.  Plaintiff has not alleged facts that
would show that the conduct at issue occurred *because of* Plaintiff's disability.

find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as

hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic." *Id.*

(citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  "[A] hostile environment is [not]

something that exists in some absolute way, like poisonous chemicals in the air, affecting

everyone who comes in contact with it." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502,

513 (S.D.N.Y. 2010) (Lynch, J., sitting by designation).  "Title VII does not prohibit employers

from maintaining nasty, unpleasant workplaces . . . .  Rather, it prohibits employers from

discriminating against an employee (including by subjecting him or her to hostile working

conditions) because of such individual's [protected characteristics]." *Id.* (internal quotation

marks omitted).  "Plaintiff [her]self must be the target of the hostile work environment and

subjected to the hostility *because of* membership in a protected class." *Sherman*, 2020 WL

2136227, at *6.  "As Circuit Judge Lynch, then sitting as a district judge by designation put it:

'The prohibited causal factor requirement . . . flows directly from the text of Title VII, and from

the very essence of its nature as an *anti-discrimination* law.'" *Id.* (quoting *Krasner*, 680 F. Supp.

2d at 513).  "The prohibited causal factor requirement makes clear that a . . . 'hostile

environment' in the Title VII context is not one that is bad for all living things in a manner that

happens to involve [characteristics of the protected class]; rather, it is one that is *discriminatorily*

hostile to an employee based on *his* or *her* [membership in the protected class]." *Krasner*, 680 F.

Supp. 2d at 514.

   "It is well established that Title VII does not set forth a general civility code for the

American workplace, but rather is limited to the prevention of discrimination based on . . .

protected characteristics." *Id.* at 519 (internal quotation marks and citation omitted).  "The

prohibited causal factor requirement plays a critical role—in conjunction with the other elements

of a hostile environment claim—in ensuring that 'the federal courts [do not] become a court of personnel appeals.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). "Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."  *Alfano*, 294 F.3d at 377.

Plaintiff's hostile work environment claim fails because it lacks this causal linkage.  For the same reasons that Plaintiff is unable to raise a minimal inference of causation with respect to her claims for race and religious discrimination under Title VII, the Amended Complaint does not contain facts sufficient to raise the inference that Plaintiff faced this environment at her workplace *because of* her race or religion.  To conclude otherwise would ignore the anti-discrimination aspect of Title VII and turn this Court into "a court of personnel appeals." *Alfano*, 294 F.3d at 377.  Though Plaintiff's work environment may have been unpleasant or even "hostile" in some sense of the word, her claim must be dismissed absent additional factual allegations establishing that she was subject to this conduct due to her protected characteristics.[9]

### E.    Retaliation Claims under Title VII and the ADA

Defendants seek to dismiss Plaintiff's claims for retaliation under Title VII and the ADA because they argue that Plaintiff has not sufficiently pleaded a causal connection between her protected activity and any adverse employment action for retaliation claims.  Dkt. No. 17 at 22–23.  Plaintiff contends that, after she engaged in protected activity, she was treated differently in a number of ways from those that had not engaged in protected activity, and that her retaliation claim should not be dismissed.  Dkt. No. 20 at 24–25.

---

[9] The Court therefore need not reach the question whether the Amended Complaint sufficiently alleges conduct that was "severe and pervasive."  *Sherman*, 2020 WL 2136227, at *5.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Littlejohn*, 795 F.3d at 315.  "To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* at 315–16.  Stated otherwise, for a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90.

To properly allege protected activity, a plaintiff "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999).  It is sufficient that she had a good faith reasonable belief that the underlying challenged actions of the employer violated the law.  *Id.* Protected activity includes "informal protests of discriminatory employment practices, including making complaints to management," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), but generalized complaints about a supervisor's treatment unrelated to Title VII are not sufficient, *Mejia v. White Plains Self Storage Corp.*, 2020 WL 247995, at *6 (S.D.N.Y. Jan. 16, 2020) (collecting cases).

Further, in the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination" and is not limited to discriminatory actions that affect the terms and conditions of employment. *Id.* However, when courts make this determination, the Supreme Court has emphasized that "it is important to separate significant from trivial harms." *White*, 548 U.S. at 68. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Though "[t]he antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanism," "normally petty slights, minor annoyances, and simple lack of good manners" will not deter employees from complaining about discriminatory behavior. *Id.* When evaluating "the significance of any given act of retaliation," the "[c]ontext matters." *Id.*

"As for causation, a plaintiff must plausibly plead a connection between the act and [her] engagement in protected activity." *Vega*, 801 F.3d at 90 (citing 42 U.S.C. § 2000e-3(a)). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Id.* Unlike discrimination claims, "for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.* In other words, "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* at 90–91. "But-for causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the

absence of the retaliatory motive." *Id.* at 91 (internal quotation marks omitted and alterations adopted) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

ADA retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework established for Title VII cases. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases.").

The parties do not dispute that Plaintiff engaged in some protected activity or that Defendants knew about the protected activity. The Amended Complaint alleges that, on or about June 19, 2019, Plaintiff filed an internal complaint claiming race and disability discrimination and retaliation for prior complaints of discrimination and that, on or about July 22, 2019, Plaintiff filed an external complaint of discrimination based on race, disability, and retaliation with the NYSDHR.[10]  Am. Compl. ¶¶ 39, 44.

---

[10] Plaintiff further argues that she was engaged in protected activity during the duration of: (1) her previously filed federal lawsuit in 2010 that concluded in July 2015; (2) an internal complaint from 2014 that was not dismissed until February 11, 2020; and (3) after her email request for equal and fair dissemination of work assignments on December 23, 2020.  Dkt. No. 20 at 24.  This argument fails for several reasons.  First, assuming Plaintiff's prior federal lawsuit constituted protected activity, its conclusion in 2015 is too far removed temporally to raise an inference that any of the conduct from 2018 to 2020 was motivated by retaliatory purpose.  *See Gilford v. N.Y.S. Office of Health*, 2020 WL 1529359, at *4 (S.D.N.Y. Mar. 31, 2020) ("Courts in this Circuit have held that the passage of two months between protected activity and adverse action [for retaliation] can be too long, without more, to support an inference of causation.").  Second, the same is true for Plaintiff's internal complaint from 2014; and the allegation that the complaint was not dismissed until February 11, 2020 is not included in the Amended Complaint and therefore not cognizable on a motion to dismiss.  *See Cota v. Art Brand Studios, LLC*, 2021 WL 4864588, at *14 (S.D.N.Y. Oct. 15, 2021) ("It is well-settled that a party cannot amend its complaint in an opposition brief." (collecting cases)).  Third, Plaintiff's email regarding fair work assignments cannot be considered protected activity because there are no allegations suggesting that the email notified Defendants of any discriminatory misconduct.  *See Sherman*, 2020 WL 2136227, at *7 ("[A]lthough complaints need not mention discrimination or use particular language, ambiguous complaints must make the employer aware of the alleged

The parties do, however, dispute whether the Amended Complaint sufficiently alleges that Plaintiff was thereafter subject to any adverse actions and, if so, whether the allegations establish a causal link between any protected activity and adverse retaliatory actions.  After Plaintiff's June 19, 2019 internal complaint, the Amended Complaint alleges that Plaintiff faced the following retaliatory acts:  (1) on or about June 20, 2019, Farnham scheduled a disciplinary meeting for Plaintiff alleging baseless charges and then issued a lengthy disciplinary letter-to-file, Am. Compl. ¶ 41; (2) Farnham and Gutwein announced that Alter would be moved from the Queens Team to the Manhattan Team thereby increasing Plaintiff's workload substantially; Alter knew this change was coming and was informed of this decision two weeks before, *id.* ¶ 42; and (3) on July 22, 2019, Gutwein ordered Plaintiff to hand-deliver a disciplinary letter-to-file, *id.* ¶ 43.  Additionally, after Plaintiff's July 22, 2019 external complaint, Plaintiff alleges the following retaliatory acts:  (1) she "soon thereafter" was assigned three consecutive difficult cases, *id.* ¶ 44; (2) on or about August 14, 2019, Farnham screamed at Plaintiff for falling behind on her work when Plaintiff's computer malfunctioned, *id.* ¶¶ 45–48; (3) on or about August 19, 2019, Plaintiff "was disciplined amongst a litany of things including starting an outside complaint that Mia Delane Gurley (Executive Director – Committees on Special Education) was not made aware of," *id.* ¶ 50; (4) on or about November 4, 2019, Gutwein "again stated" that Plaintiff should not add her half-hour lunch to the end of her workday, *id.* ¶ 51; (5) as of December 23, 2020, Plaintiff's workload increased further, *id.* ¶ 58; (6) Plaintiff was micromanaged and publicly derided and humiliated during staff meetings, *id.* ¶¶ 59–60; and (7) Plaintiff was called into a four-hour disciplinary meeting and issued another disciplinary letter-to-file, *id.* ¶¶ 61–64.

---

discriminatory misconduct to put the employer on notice.").

In this particular context, the allegations that Plaintiff was ordered to hand-deliver a disciplinary letter, screamed at, told again she could not take her lunch at the end of the day, micromanaged, and publicly derided and humiliated fall into the category of "petty slights, minor annoyances, and simple lack of good manners" that do not constitute retaliatory action. *White*, 548 U.S. at 68; *see also Ziyan Shi v. New York Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019) (concluding that allegations that supervisor "yelled and screamed" at plaintiff "causing [p]laintiff to feel humiliated and afraid" do not rise to the level of an adverse employment action for Title VII retaliation). Additionally, that Plaintiff alleges that she endured the same conduct before engaging in protected activity further belies the conclusion that retaliation was a but-for cause of this conduct. *See Baez v. New York*, 629 F. App'x 116, 119 (2d Cir. 2015) (summary order) ("[T]he fact that the alleged retaliatory course of conduct began long before she [engaged in protected activity] undercuts any inference of a causal connection between the two." (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001))); *see also Wright v. New York City Off-Track Betting Corp.*, 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008) (concluding, on summary judgment, that "[i]f an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory"). The same logic applies to Plaintiff's allegations about the timing of Plaintiff's lunch because Gutwein was merely repeating something she had previously told Plaintiff.

The allegations that, after engaging in protected activity, the amount and difficulty of Plaintiff's workload increased likewise do not state a claim for retaliation. Assuming—without necessarily concluding—that an increased and more difficult workload could dissuade a reasonable worker from making or supporting a charge of discrimination,[11] the Court finds the

---

[11] "The assignment of a challenging workload is 'not sufficiently adverse to support either a

causal nexus lacking in the Amended Complaint.  Rather than supplying any direct evidence of retaliatory motive, Plaintiff relies on temporal proximity to establish an inference of causation. The earliest protected activity at issue in this case was Plaintiff's internal complaint on or about June 19, 2019.  It is unclear from the Amended Complaint when exactly Plaintiff's supervisors announced that Alter would be shifting teams, but the announcement allegedly took place in June 2019.  If the change was announced before June 19, 2019, the allegations cannot raise the inference that the allegedly retaliatory change was causally linked to Plaintiff's complaint because the change was announced *before* the complaint.  *See Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliation where the protected activity occurred after the adverse employment action."); *Bonilla v. City of New York*, 2019 WL 6050757, at *16 (S.D.N.Y. Nov. 15, 2019) (concluding that adverse action that occurred before plaintiff filed a complaint could not have been in retaliation for protected activity); *see also Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 534 (S.D.N.Y. 2015) (stating on summary judgment that, "[i]n order for an employment action to be retaliatory, it must occur after the protected activity for which an employee is being retaliated against").  However, even if the change was announced on or after June 19, 2019 but before the end of June 2019, the allegations would still not sustain a retaliation claim.  The face of the pleadings reveals that, even if the decision was *announced* at the end of June, the decision was *made* "a full two weeks" earlier, which would have been before Plaintiff's June 19th complaint was lodged.  Am.

---

discrimination or a retaliation claim.'" *Ziyan Shi*, 393 F. Supp. 3d at 338 (quoting *Osby v. City of New York*, 748 F. App'x 375, 378 (2d Cir. Sept. 7, 2018) (summary order)).  But "an increase in workload may sometimes be an adverse action for the purposes of a retaliation claim if the increase is heavily disproportionate to other employees similarly situated." *Id.* (quoting *Hiralall v. Sentosacare, LLC*, 2016 WL 1126530, at *13 (S.D.N.Y. Mar. 18, 2016)).  For the reasons given, *see supra* Section I.B, the Amended Complaint does not allege a heavily disproportionate increase in workload compared to similarly situated employees.

Compl. ¶ 42.  Such a change that was put in motion before Plaintiff made an internal complaint

cannot sustain Plaintiff's retaliation claims.  *See Slattery*, 248 F.3d at 95 ("Where timing is the

only basis for a claim of retaliation, and gradual adverse job actions began well before the

plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.");

*Chung v. City Univ. of New York*, 2014 WL 1146811, at *4 (S.D.N.Y. Aug. 27, 2014)

("Plaintiff's alleged protected activity cannot be the but-for cause of actions that were already

allegedly being taken against Plaintiff before he engaged in the protected activity."), *aff'd*, 605 F.

App'x 20 (2d Cir. 2015); *Greene v. Brentwood Union Free Sch. Dist.*, 576 F. App'x 39, 42 (2d

Cir. 2014) (concluding, in reviewing district court decision on summary judgment, that "[t]here

is no possible causal nexus between the protected activity and the adverse action" when

complaints about discrimination were made after decision to recommend termination (internal

quotation marks omitted)).

   Additionally, no inference of causation arises from the allegation that, after Plaintiff filed

an external complaint, she was "[s]oon thereafter" assigned three consecutive difficult cases.

Am. Compl. ¶ 44.  Because the Amended Complaint contains no allegations directly establishing

retaliatory motive, it relies on temporal proximity to establish a causal connection.  *See Vega*,

801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity

followed closely in time by adverse employment action.").  But, to survive a motion to dismiss, a

plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of

action's elements."  *Twombly*, 550 U.S. at 555.  Though precise dates are not required at the

pleading stage, Plaintiff cannot rely on the conclusory allegation that she was "[s]oon thereafter"

assigned the difficult cases.  More is needed to plausibly state a claim.

What is left are the allegations regarding the various instances of discipline, disciplinary meetings, and disciplinary letters-to-file after Plaintiff engaged in protected activity; based on some of these allegations, Plaintiff states a claim for retaliation.  The Court addresses causation first.  Assuming for the moment that these allegations amount to adverse employment actions in the retaliation context, the Court concludes that only some of these allegations establish an inference of causation based on temporal proximity.  "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90.  The allegations regarding the four-hour disciplinary meeting on June 29, 2020 and the September 18, 2020 disciplinary letter are too far removed from the protected activity to raise an inference of causation:  The disciplinary meeting occurred about eleven months after Plaintiff's external complaint and the disciplinary letter-to-file was issued almost fourteen months after the external complaint.  *See, e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012) ("[T]he temporal proximity between [the plaintiff's protected activity] and the alleged adverse employment action—somewhere between three and six months—is insufficient, standing alone, to establish a causal connection."); *Sank v. City Univ. of New York*, 2011 WL 5120668, at *10 (S.D.N.Y. Oct. 28, 2011) (determining that ten months between alleged protected activity and adverse employment action represented a "lack of temporal proximity" that "negates any possible inference" that the action "was motivated by retaliatory animus"); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 434 (S.D.N.Y. 2006) (stating, on summary judgment, that "[a]ny alleged actions that took place more than nine months after the last alleged protected activity . . . are too remote to establish a causal connection" for a retaliation claim).

However, the remaining allegations—that, on or about June 20, 2019, the day after Plaintiff's internal complaint, Farnham scheduled a disciplinary meeting alleging baseless claims and then issued a lengthy disciplinary letter-to-file and that, on or about August 19, 2019, about a month after Plaintiff's external complaint, Plaintiff was disciplined for a litany of items including starting an outside complaint—occurred "closely in time" to protected activity. *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). That Plaintiff was allegedly disciplined for starting an outside complaint also speaks to direct evidence of retaliatory motive. Thus, these allegations raise an inference of causation sufficient at the pleading stage.

The June 20, 2019 disciplinary meeting and letter and the August 19, 2019 discipline also rise to the level of an adverse employment action in the retaliation context. In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *White*, 548 U.S. at 57). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination . . . ." *Id.* As alleged here, the discipline and the disciplinary meeting and letter alleging baseless charges could deter a reasonable worker from complaining about discrimination. *See id.* at 92 ("[O]f course, a poor performance evaluation could very well deter a reasonable worker from complaining."); *Ahmad*, 2021 WL 1225875, at *26 ("A slew of falsified disciplinary charges could certainly plausibly deter [an individual] from reporting discrimination."); *Krinsky v. Abrams*, 2007 WL 1541369, at *11

(E.D.N.Y. May 25, 2007) (noting, on summary judgment that "a negative evaluation, or threat of a negative evaluation, while not an adverse employment action that affects terms and conditions of employment, might dissuade a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks omitted and alteration adopted)), *aff'd*, 305 F. App'x 784 (2d Cir. 2009).  Moreover, "[b]ecause the burden for establishing a *prima facie* case of retaliation is '*de minimis*,'" the Court concludes that Plaintiff's allegations are sufficient to survive a motion to dismiss.  *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Defendants argue that the disciplinary letters and meetings are not adverse actions for retaliation claims.  Dkt. No. 17 at 23.  But the cases cited by Defendants relied on case law, or case law that relies on case law, from before the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  *See, e.g.*, Dkt. No. 17 at 23 (citing *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006)).  "Since then, the Second Circuit has recognized that 'the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination.'"  *Ahmad*, 2021 WL 1225875, at *26 (quoting *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43–44 (2d Cir. 2019)).  Instead of considering whether the employer subjected the plaintiff to a materially adverse change in the terms and conditions of employment, the question is whether the adverse action could well have dissuaded a reasonable employee from complaining of discrimination.  *Id.*  Therefore, Defendants' argument is not persuasive.

For these reasons, Plaintiff's retaliation claims under Title VII and the ADA based on the June 20, 2019 disciplinary meeting and letter-to-file and the August 19, 2019 discipline may proceed.  The remaining Title VII and ADA retaliation claims are dismissed.

**II.      Claims Based on State and Local Law**

The Court now turns to Plaintiff's claims under the New York State Human Rights Law

("NYSRHL") and the New York City Human Rights Law ("NYCHRL").[12]

**A.      NYSHRL**

Plaintiff brings claims under the New York State Human Rights Law for discrimination

based on race, religion, and disability, for a hostile work environment, and for retaliation.  The

NYSHRL claims are governed by the same standards as the federal claims.  *See Kopchik v. Town*

*of E. Fishkill, New York*, 759 F. App'x 31, 37 (2d Cir. 2018) ("New York State disability

discrimination claims are governed by the same legal standards as federal ADA claims."

(quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004)));

*Cooper v. New York State Dep't of Lab.*, 819 F.3d 678, 680 (2d Cir. 2016) ("Employment

discrimination claims brought under the NYSHRL are analyzed identically to claims under . . .

Title VII . . . ." (citing *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 316 n.2 (2d

Cir.1999))); *Ahmad*, 2021 WL 1225875, at *23 ("Hostile work environment claims under Title

VII and the NYSHRL are judged by the same standard." (citing *Summa v. Hofstra Univ.*, 708

F.3d 115, 123–24 (2d Cir. 2013))); *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d

309, 330 (S.D.N.Y. 2020) ("The same standards govern retaliation claims under the two statutes

[i.e., Title VII and the NYSHRL].").  Therefore, for the same reasons given for the federal

---

[12] Defendants argue that any claims under NYSRHL and NYCHRL that accrued before July 22, 2018, one-year prior to the filing of Plaintiff's NYSDHR complaint, must be dismissed because New York Education Law § 3813(2-b) provides a one-year statute of limitations. Dkt. No. 17 at 6.  Plaintiff argues that her claims are not time barred because she was subjected to a continuous violation.  Dkt. No. 20 at 10–13.  "New York Law provides for a one-year statute of limitations for claims against schools, school districts, and boards of education."  *Wade v. New York City Dep't of Educ.*, 2014 WL 941754, at *6 (S.D.N.Y. Mar. 10, 2014) (citing N.Y. Educ. Law § 3813(2-b)), *aff'd*, 667 F. App'x 311(2d Cir. 2016).  For the same reasons given *supra* Section I.A, the allegations prior to July 22, 2018 are time barred and dismissed.

claims, the NYSHRL claims are dismissed except for the NYSHRL claim for retaliation premised on the June 20, 2019 disciplinary meeting and letter-to-file and the August 19, 2019 discipline.

### B.      NYCHRL

Plaintiff also brings claims under the New York City Human Rights Law for discrimination based on race, religion, and disability, for a hostile work environment, and for retaliation.

The NYCHRL was amended as part of the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local Law No. 85, with instructions that its "provisions . . . shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed."  N.Y.C. Admin. Code § 8-130(a).  Courts are instructed to view interpretations of federal or New York state statutes with similar wording "as a floor below which the City's Human Rights cannot fall."  *Loeffler v. Staten Island Uni. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting N.Y.C. Local L. No. 85 § 1).  "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

The NYCHRL makes it unlawful for an employer, employee, or agent thereof, "because of the actual or perceived . . . race, creed, [or] . . . disability, . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(1)(a).  "[C]ourts have held that discrimination claims brought under the NYCHRL do not require a materially adverse employment action . . . ."  *Sherman*, 2020 WL 2136227, at *8.  "To prevail on liability, the plaintiff need only show differential treatment—that she is

treated 'less well'—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. "When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code.' The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss." *Id.* (citation omitted). "[W]ith respect to hostile work environment claims, the 'severe or pervasive standard of liability no longer applies to NYCHRL' but is 'relevant only to the scope of damages.'" *Sherman*, 2020 WL 2136227, at *8 (quoting *Mihalik*, 715 F.3d at 114); *see also Ahmad*, 2021 WL 1225875, at *29 ("For discrimination claims based on harassment or a hostile environment, the NYCHRL's pleading standard is lower than the NYSHRL's. It imposes liability for harassment short of 'severe or pervasive,' although the severity and pervasiveness of misconduct is germane to damages."). Retaliation is also prohibited under the NYCHRL; "to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted).

Like Plaintiff's federal and state discrimination claims based on race, religion, and disability, Plaintiff's NYCHRL discrimination claims based on race, religion, and disability fail to state a claim notwithstanding the NYCHRL's broader scope. As discussed *supra* Sections I.B.2 and I.C, the Amended Complaint fails to show that Plaintiff experienced differential treatment *because of* a discriminatory intent.

Similarly, Plaintiff also fails to state a claim for a hostile work environment under the NYCHRL. As discussed *supra* Section I.D, the Amended Complaint does not raise the inference that Plaintiff faced the alleged workplace misconduct due to her protected characteristics. This

reasoning does not rely on the existence of severe or pervasive misconduct, which is not required by the NYCHRL.

Finally, the Court considers the claim for retaliation under the NYCHRL.  Plaintiff's retaliation claims that survive under federal and state law necessarily survive under the broader NYCHRL.  The remaining allegations do not state a claim for retaliation under the NYCHRL. The allegations that fall into the category of "petty slights, minor annoyances, and simple lack of good manners," *White*, 548 U.S. at 68, are not the type of conduct that is reasonably likely to deter a person from complaining about discrimination.  And the allegations regarding increased and more difficult workload fail as well because the Amended Complaint does not allege either that Plaintiff engaged in protected activity before the alleged retaliation or that an inference of causation could arise from the allegations.

For these reasons, Plaintiff's NYCHRL claims are dismissed except for Plaintiff's retaliation claim based on the June 20, 2019 disciplinary meeting and letter-to-file and the August 19, 2019 discipline.

## CONCLUSION

The motion to dismiss is GRANTED IN PART AND DENIED IN PART.  The Court denies Defendants' motion with respect to Plaintiff's retaliation claims under Title VII, the ADA, the NYSHRL, and the NYCHRL premised on the June 20, 2019 disciplinary meeting and letter-to-file and the August 19, 2019 discipline.  The Court grants Defendants' motion to dismiss as to all other claims without prejudice to filing amended pleadings within thirty (30) days of the date of this order.

The Clerk of Court is respectfully directed to close Dkt. No. 16.

SO ORDERED.

Dated: February 2, 2022
     New York, New York

                             LEWIS J. LIMAN
                   United States District Judge